**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **And** | |
| **LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY** | Case No. 2:22-cv-5361 |
| *Plaintiffs*, | |
| **v.** | |
| **PACKAGING CORPORATION OF AMERICA,** *Defendant*. | |

## COMPLAINT

Plaintiffs, the United States of America ("United States"), by the authority of the Attorney General and through the undersigned attorneys, and acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the Louisiana Department of Environmental Quality ("LDEQ") file this Complaint and allege as follows:

## NATURE OF THE ACTION

1.      This civil action seeks civil penalties pursuant to Section 113(b) of the Clean Air Act ("Clean Air Act" or "Act"), 42 U.S.C. § 7413(b), against Packaging Corporation of America ("PCA" or "Defendant").  The Complaint alleges that PCA violated Sections 112(r)(1) and 112(r)(7) of the Act, 42 U.S.C. §§ 7412(r)(1) and (r)(7), and the Chemical Accident Prevention Provisions promulgated at 40 C.F.R. Part 68 (the "Risk Management Program Regulations") at its containerboard production facility located at 4200 U.S. Highway 190 West in DeRidder, Beauregard Parish, Louisiana (the "DeRidder Mill" or "Mill").

2.      Plaintiff LDEQ joins the Complaint, alleging that PCA violated Louisiana Administrative Code ("LAC") 33:III.5901.A, which incorporates the Risk Management Program Regulations by reference, at the DeRidder Mill.  LDEQ seeks civil penalties pursuant to La. R.S. 30:2025(E)(1)(a), against PCA.

3.      On February 8, 2017, an explosion at the DeRidder Mill killed three contract workers and injured seven others (the "Explosion").  These workers, from Elite Welding, LLC ("Elite"), were performing welding repairs on the cracked intersection of a vertical eight-inch clean condensate pipeline and a three-inch pipeline near the Mill's 100,000-gallon foul condensate tank.  This tank accumulates harmful vapors, referred to as "non-condensable gases," which are a byproduct of the Mill's kraft pulping process used to make containerboard.  The tank, which was supposed to have been emptied before the welding work began, still contained liquid and highly flammable non-condensable gases, including methanol and turpentine.

4.      While Elite's workers were welding the intersection of the eight-inch clean condensate pipeline and the three-inch pipeline, flammable vapors from the foul condensate tank ignited.  The resulting Explosion blasted the top of the tank over a six-story building before it landed on other Mill process equipment approximately 375 feet away.  In addition to the three fatalities it caused, the Explosion released an estimated 2,453 pounds of methanol (in a 1% solution) and a yet-to-be-determined quantity of turpentine.

5.      Following the Explosion, EPA inspected the DeRidder Mill.  The inspection and associated investigation identified the Clean Air Act violations now alleged in this Complaint, some of which are unrelated to the Explosion.

**JURISDICTION, VENUE, AUTHORITY, AND NOTICE**

6.      This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345, and 1355.

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1367 over LDEQ's claims under the Louisiana Environmental Quality Act because those claims are so related to the claims alleged in the United States' action that they form part of the same case or controversy.

8.      Venue is proper in this judicial district pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395.  PCA does business in this judicial district at the DeRidder Mill and the Complaint's claims arose within this judicial district.

**NOTICE**

9.      Notice of the commencement of this action was given to co-Plaintiff LDEQ at least thirty (30) days prior to the filing of this Complaint under Section 113(b) of the Act, 42 U.S.C. § 7413(b).

**AUTHORITY**

10.      The United States Department of Justice has authority to bring this action on behalf of EPA under 28 U.S.C. §§ 516 and 519, and under Section 305(a) of the Act, 42 U.S.C. § 7605(a).

11.      LDEQ has authority to bring this action pursuant to La. R.S. 30:2025(B).

**THE DEFENDANT AND THE DeRIDDER MILL**

12.      PCA is a publicly traded corporation incorporated under the laws of the State of Delaware and headquartered in Illinois.

13.     Defendant is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

14.     Since 2013 and at all times relevant to this Complaint, Defendant has been the owner or operator, within the meaning of Section 112(a)(9) of the Act, 42 U.S.C. § 7412(a)(9), and the Risk Management Program Regulations, of the DeRidder Mill.  The Mill began operations in 1969 and was formerly owned and operated by Boise Inc. until PCA acquired it in 2013.

15.     The DeRidder Mill is located approximately five miles west of downtown DeRidder, Louisiana, a town with an estimated population of 10,578.  The DeRidder Mill employs approximately 530 workers and produces 874,000 tons of containerboard annually.  Containerboard, commonly known as cardboard, is typically used to make corrugated containers, such as boxes and other types of packaging.

16.     The DeRidder Mill includes a kraft pulping process that uses high temperature and pressure to "digest" pine wood chips into pulp for making containerboard.  The pulping process produces wastewater, which the Defendant treated onsite using chlorine in its Mill Water Chlorine System until October 15, 2018.

17.     The kraft pulping process also produces harmful vapors, referred to as non-condensable gases.  Prior to and including the date of the Explosion, these non-condensable gases typically accumulated in the DeRidder Mill's foul condensate tank and included methanol and turpentine.

18.     Prior to October 15, 2018, PCA's Mill Water Chlorine System included six chlorine gas sensors positioned at various locations throughout the Mill.  Four chlorine gas sensors surrounded a group of ten one-ton chlorine storage cylinders, one sensor was located

near a pipeline to the Mill's water reservoir, and one sensor was located near the access door to the chlorination building.

## STATUTORY AND REGULATORY FRAMEWORK

19.     The objective of Clean Air Act Section 112(r), 42 U.S.C. § 7412(r), and the Risk Management Program Regulations, is "to prevent the accidental release" of any "extremely hazardous substance" or any substance listed pursuant to Section 112(r)(3) of the Act, and to "minimize the consequences of any such release."  42 U.S.C. § 7412(r)(1) and (3).

20.     A "regulated substance" includes any substance listed pursuant to Section 112(r)(3) of the Act or set forth in 40 C.F.R. § 68.130, Tables 1, 2, 3, and 4.  *See* 42 U.S.C. § 7412(r)(2)(B).  Regulated substances include both toxic (40 C.F.R. § 68.130, Tables 1 and 2) and flammable substances (40 C.F.R. § 68.130, Tables 3 and 4).

21.     Extremely hazardous substances include substances listed pursuant to Section 112(r)(3) of the Act, 42 U.S.C. § 7412(r)(3), regulated substances listed at 40 C.F.R. § 68.130, and chemicals on the list of extremely hazardous substances published under Section 302 of the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11002, at 40 C.F.R. Part 355, Appendices A and B.  Extremely hazardous substances also include other agents which may, as the result of short-term exposures associated with releases to the air, cause death, injury or property damage due to their toxicity, reactivity, flammability, volatility or corrosivity.  S. Rep. 101-228 at 212 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3596.  The release of any substance which causes death or serious injury because of its acute toxic effect or as the result of explosion or fire or which causes substantial property damage by blast, fire, corrosion, or other reaction would create a presumption that such substance is extremely hazardous.  *See id.*

22.     An "accidental release" is defined by Section 112(r)(2)(A) of the Act, 42 U.S.C. § 7412(r)(2)(A), as "an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source."

**A.  The General Duty Clause**

23.     Section 112(r)(1) of the Act, 42 U.S.C. § 7412(r)(1), mandates three distinct general requirements for owners and operators of stationary sources, like the Defendant's DeRidder Mill, that produce, process, handle, or store listed regulated substances and other extremely hazardous substances.  Section 112(r)(1) of the Act provides:

> The owners and operators of stationary sources producing, processing, handling or storing [extremely hazardous substances or regulated substances] have a general duty . . . to identify hazards which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur.

42 U.S.C. § 7412(r)(1) (hereinafter the "General Duty Clause").

**B.  The Risk Management Program Regulations**

24.     In order to prevent accidental releases of regulated substances, Section 112(r)(7) of the Act, 42 U.S.C. § 7412(r)(7)(A), requires EPA to "promulgate release prevention, detection, and correction requirements which may include monitoring, record-keeping, reporting, training, vapor recovery, secondary containment, and other design, equipment, work practice, and operational requirements."

25.     In 1994, in accordance with Clean Air Act Section 112(r)(7), 42 U.S.C. § 7412(r)(7), EPA promulgated the Risk Management Program Regulations.  Pursuant to Section 112(r)(7)(E) of the Act, it is unlawful for any person to operate any stationary source subject to the Risk Management Program Regulations in violation of the requirements.

26.     The Risk Management Program Regulations apply to owners and operators of a "covered process."  Covered processes are stationary sources that have more than a threshold quantity of a regulated substance in a "process."  *See* 40 C.F.R. § 68.10(a); *see also* 40 C.F.R. § 68.3 (defining "covered process").

27.     "Process" is defined in 40 C.F.R. § 68.3 to mean:

> "any activity involving a regulated substance including any use, storage, manufacturing, handling, or on-site movement of such substances, or any combination of these activities.  For the purposes of this definition, any group of vessels that are interconnected, or separate vessels that are located such that a regulated substance could be involved in a potential release, shall be considered a single process."

28.     For stationary sources that include these "covered process[es]," their owners and operators must develop and implement a risk management program, which must be described in a risk management plan ("RMP").  *See* 40 C.F.R. § 68.12(a).  The RMP must be submitted to EPA and must include, among other things, a management system, a hazard assessment, and a prevention program.  *See id.*

29.     Covered processes are divided into three categories, designated as "Program 1," "Program 2," and "Program 3."  Each program level sets forth specific, and increasingly stringent, requirements for owners and operators of stationary sources with processes that fall within the respective programs.  Pursuant to 40 C.F.R. § 68.10(i), a covered process is subject to Program 3 requirements if the process does not meet the Program 1 eligibility requirements set forth in 40 C.F.R. § 68.10(g) and the process is subject to the United States Occupational Safety and Health Administration ("OSHA") process safety management standard set forth in 29 C.F.R. § 1910.119.

30.     Pursuant to 40 C.F.R. § 68.12, the owner or operator of a stationary source with a process subject to the Program 3 requirements of the Risk Management Program Regulations

must, among other things, comply with the prevention requirements of 40 C.F.R. §§ 68.65 –
68.87.  *See* 40 C.F.R. § 68.12(d)(3).

31.     These prevention requirements include a variety of actions to prevent accidental
releases of hazardous substances and minimize the consequences of any accidental releases that
do occur.  These actions include compiling process safety information about the covered process
(40 C.F.R. § 68.65), developing and implementing written operating procedures for the covered
process (40 C.F.R. § 68.69), developing and implementing a program to preserve the mechanical
integrity of the covered process (40 C.F.R. § 68.73), management of change procedures (40
C.F.R. § 68.75), issuing hot work permits (40 C.F.R. § 68.85), and developing and implementing
an emergency response program (as provided in 40 C.F.R. § 68.95).

<u>Process Safety Information (40 C.F.R. § 68.65)</u>

32.     Pursuant to 40 C.F.R. § 68.65(a), the owner or operator of a covered process must
complete a compilation of written process safety information before conducting any process
hazard analysis of the covered process.  The compilation of written process safety information
enables the owner or operator, and the employees involved in operating the process, to identify
and understand the hazards posed by the covered process.

33.     Process safety information must include information pertaining to the hazards of
the regulated substances in the process (40 C.F.R. § 68.65(b)), technology of the process (40
C.F.R. § 68.65(c)), and information pertaining to the equipment in the process (40 C.F.R.
§ 68.65(d)).

34.     Pursuant to 40 C.F.R. 68.65(d)(1)(ii), the written process safety information
pertaining to the equipment must include piping and instrumentation diagrams, among other
information.

Operating Procedures (40 C.F.R. § 68.69)

35.     Pursuant to 40 C.F.R. § 68.69(a), the owner or operator of a covered process must develop and implement written operating procedures that provide clear instructions for safely conducting activities involved in each covered process consistent with the process safety information.

36.     Pursuant to 40 C.F.R. § 68.69(c), operating procedures must be reviewed as often as necessary to assure that they reflect current operating practice, including changes that result from changes in process chemicals, technology, equipment, and changes to stationary sources. The owner or operator must certify annually that these operating procedures are current and accurate.

Mechanical Integrity (40 C.F.R. § 68.73)

37.     Pursuant to 40 C.F.R. § 68.73(a) and (b), the owner or operator of a covered process must establish and implement written procedures to maintain the ongoing mechanical integrity of process equipment such as pressure vessels, storage tanks, piping systems (including piping components such as valves), relief and vent systems and devices, emergency shutdown systems, controls (including monitoring devices and sensors, alarms, and interlocks), and pumps.

38.     Pursuant to 40 C.F.R. § 68.73(c), the owner or operator must train each employee involved in maintaining the on-going mechanical integrity of process equipment in an overview of that process and its hazards and in the procedures applicable to the employee's job task to assure that the employee can perform the job tasks in a safe manner.

39.     Pursuant to 40 C.F.R. § 68.73(d)(4), the owner or operator must document each inspection and test that has been performed on process equipment, with documentation identifying the date of the inspection or test, the name of the person who performed the

inspection or test, the serial number or other identifier of the equipment on which the inspection

or test was performed, a description of the inspection or test performed, and the results of the

inspection or test.

Management of Change (40 C.F.R. § 68.75)

40.     Pursuant to 40 C.F.R. § 68.75(a), the owner or operator of a covered process must

establish and implement written procedures to manage changes to process chemicals,

technology, equipment, and procedures; and changes to stationary sources that affect a covered

process.

41.     Pursuant to 40 C.F.R. § 68.75(c), employees and contractors whose job tasks will

be affected by a change in the process must be informed of, and trained in, the change prior to

start-up of the process or affected part of the process.

Hot Work Permits (40 C.F.R. § 68.85)

42.     Pursuant to 40 C.F.R. § 68.85(a), the owner or operator of a covered process must

issue a hot work permit for hot work operations conducted on or near a covered process.  "Hot

work" means work involving electric or gas welding, cutting, brazing, or similar flame or spark-

producing operations.  *See* 40 C.F.R. § 68.3.

43.     Pursuant to 40 C.F.R. § 68.85(b), the hot work permit for hot work operations

conducted on or near a covered process must document that the fire prevention and protection

requirements in the Occupational Safety and Health Standards, 29 C.F.R. § 1910.252(a), have

been implemented prior to beginning the hot work operations.  The permit must: (i) indicate the

date(s) authorized for hot work, (ii) identify the object on which hot work is to be performed, and

(iii) be kept on file until completion of the hot work operations.

44.     Pursuant to 29 C.F.R. § 1910.252(a)(2)(iii), fire watchers are required whenever welding or cutting is performed in locations where a non-minor fire might develop.

45.     Pursuant to 29 C.F.R. §§ 1910.252(a)(2)(iii)(A)(4) and (a)(2)(iii)(B), when combustible materials are adjacent to the opposite side of metal partitions, walls, ceilings, or roofs and are likely to be ignited by conduction or radiation, fire watchers must have fire extinguishing equipment readily available and be trained in its use.  Fire watchers must watch for fires in all exposed areas, try to extinguish them only when obviously within the capacity of the equipment available, or otherwise sound an alarm.  A fire watch must be maintained for at least a half hour after completion of the hot work to detect and extinguish possible smoldering fires.

Emergency Response Program (40 C.F.R. § 68.95)

46.     Pursuant to 40 C.F.R. § 68.95(a), the owner or operator of a covered process must develop and implement an emergency response program.

47.     Pursuant to 40 C.F.R. § 68.95(a)(2), the emergency response program must include procedures for the use of emergency response equipment and for its inspection, testing, and maintenance.

Recordkeeping (40 C.F.R. § 68.200)

48.     Pursuant to 40 C.F.R. § 68.200, the owner or operator of a covered process must maintain records supporting the implementation of the Risk Management Program Regulations for five years, unless otherwise provided in 40 C.F.R. Subpart D.

**C.  Louisiana's Regulations**

49.     The Louisiana Air Control Law, La. R.S. 30:2051 *et. seq.*, states that "[n]o person shall . . . [v]iolate any rule or regulation adopted by the secretary under this chapter."  La. R.S. 30:2057(A)(2).

50.     On November 20, 1996, LDEQ adopted the Risk Management Program Regulations and incorporated them by reference at LAC 33:III.5901.A.

51.     La. R.S. 30:2025(E)(1)(a) authorizes LDEQ to seek civil penalties "of not more than the cost to the state of any response action made necessary by such violation which is not voluntarily paid by the violator, and a penalty of not more than [$32,500] for each day of violation."

52.     La. R.S. 30:2025(C)(3) authorizes LDEQ to commence a civil action for appropriate relief, including a temporary or permanent injunction.

**D.   Enforcement of the Clean Air Act**

53.     Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes EPA to commence a civil action for injunctive relief and to assess and recover a civil penalty of up to $25,000 per day for each violation of Subchapter I of the Act (42 U.S.C. §§ 7401-7515).

54.     Pursuant to EPA's Civil Monetary Inflation Adjustment Rule, 40 C.F.R. Part 19, the maximum amount of civil penalties authorized under Section 113(b) of the Act increased to $37,500 per day for portions of each violation occurring after December 6, 2013 through November 2, 2015.  *See* 87 Fed. Reg. 1676 (Jan. 12, 2022); 40 C.F.R. § 19.4, Table 2.

55.     Pursuant to EPA's Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19, the maximum amount of civil penalties authorized under Section 113(b) of the Act increased to $109,024 per day for each violation occurring after November 2, 2015, when penalties are assessed on or after January 12, 2022.  *See* 87 Fed. Reg. 1676 (Jan. 12, 2022); 40 C.F.R. § 19.4, Table 1.

## GENERAL ALLEGATIONS

56.     At all times relevant to this Complaint, the DeRidder Mill was a "stationary source" within the meaning of Section 112(r)(2)(C) of the Act, 42, U.S.C. § 7412(r)(2)(C) and 40 C.F.R. § 68.3.  The Mill included buildings and equipment belonging to the same industrial group (NAICS group 22131 – Water Supply and Irrigation Systems) which were located on one contiguous property under PCA's control.

### The DeRidder Mill uses toxic and highly flammable substances

57.     At all times relevant to this Complaint, the DeRidder Mill produced, processed, handled, and stored regulated substances and extremely hazardous substances within the meaning of Sections 112(r)(1) and (3) of the Act, 42 U.S.C. § 7412(r)(1) and (3), including chlorine, methanol, and turpentine.

58.     Chlorine is an extremely hazardous substance and a listed, toxic regulated substance.  *See* 42 U.S.C. § 7412(r)(3) and 40 C.F.R. § 68.130 (Tables 1 & 2).  Chlorine is "known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment."  42 U.S.C. § 7412(r)(3).

59.     Methanol and turpentine are deemed "highly flammable" by the National Fire Protection Association ("NFPA").  Methanol can be ignited under ambient temperature conditions and accumulations of its vapors in confined spaces may explode if ignited.  NFPA Standard 497 specifically lists methanol and turpentine as combustible materials.  *See* NFPA 497, Table 4.4.2 (2017 ed.).

60.     Both methanol and turpentine are listed in the OSHA Occupational Chemical Database, which details their explosive limits, flash points, and fire ratings.  Both substances have a fire rating of three out of four, meaning they can both ignite under normal temperature

conditions.  *See* NFPA 704 (2017 ed.).

61.     At all times relevant to this Complaint, the Defendant's Mill Water Chlorine System was a covered process because it contained at least the threshold quantity of 2,500 pounds of chlorine.  *See* 40 C.F.R. § 68.130 (Tables 1 and 2).

62.     At all times relevant to this Complaint, the Defendant's Mill Water Chlorine System was a Program 3 covered process.  The process is subject to the OSHA process safety management standard and does not meet the requirements to be categorized as a Program 1 covered process, pursuant to 40 C.F.R. § 68.10(i)(2).  The Defendant was also subject to the Program 3 requirements referenced in 40 C.F.R. § 68.12(d).

63.     At all times relevant to this Complaint, the Defendant was subject to the General Duty Clause of the Clean Air Act Section 112(r)(1), regarding the prevention of "accidental releases" at the Mill, as defined in Section 112(r)(2)(A), 42 U.S.C. § 7412(r)(2)(A).

**PCA was aware of applicable industry standards created to prevent the Explosion**

64.     Both the Technical Association of the Pulp and Paper Industry ("TAPPI") and NFPA have established industry standards for working on concentrated non-condensable gases, such as those released during the Explosion.  The foul condensate tank accumulated non-condensable gases and water vapors from the kraft pulping process and was connected to the Mill's concentrated non-condensable gas system via vent piping.

65.     Pursuant to the TAPPI Technical Information Paper ("TIP") 0416-09, "[i]f maintenance work is required on all or part of the [concentrated non-condensable gas] system, the affected part must be isolated, drained, purged with air or steam, and checked for the presence of toxic and flammable gases before entry or welding."  TAPPI, TIP 0416-09, Collection and burning of concentrated non-condensable gases: regulations, design and

operation, *Tech. Ass'n of the Pulp and Paper Ind.* (April 2014).  At all times relevant to this

Complaint, TAPPI TIP 0416-09 outlined industry-wide precautionary guidance relevant to the

maintenance work near PCA's foul condensate tank, such as the welding work performed prior

the Explosion.

66.     NFPA also established standards for performing hot work near combustible

materials, such as those found inside the foul condensate tank.  NFPA Standard for Fire

Prevention During Welding, Cutting, and Other Hot Work, known as "NFPA 51B," states that

"all combustibles shall be relocated at least 35 ft (11 M) in all directions from the work site."

NFPA 51B § 5.4.2(3) (2014 ed.).  Should relocation be impractical, combustibles must be

protected by a welding curtain, blanket, pad, or equivalent.  *See id.*  At all times relevant to this

Complaint, NFPA 51B outlined industry-wide precautionary guidance relevant to the hot work

performed near PCA's foul condensate tank, such as the welding work performed prior to the

Explosion.

67.     The Defendant's own 2013 Hot Work Permit Procedure expanded upon NFPA

Standard 51B, reflecting that PCA was aware of the risks covered by NFPA Standard 51B.

PCA's procedures listed a series of requirements within 35 feet of hot work, to include the

removal of combustibles "where possible."  At all times relevant to this Complaint, the standards

in the Defendant's 2013 Hot Work Permit Procedure applied to hot work performed near PCA's

foul condensate tank, such as the welding work performed prior to the Explosion.

## The Explosion

68.     On October 28, 2016, the Defendant was notified of a leak on the vertical eight-

inch clean condensate pipeline within the DeRidder Mill's kraft pulping process.  The clean

condensate pipeline was located above the foul condensate tank and was connected to it via a

three-inch horizontal pipeline.  After being notified of the leak, the Defendant performed a temporary repair to address the leak.  Because permanently repairing the leak required welding the clean condensate pipeline, these permanent repairs were scheduled for a subsequent annual shutdown of the Mill.

69.     As planned, the Defendant began the annual shutdown on February 5, 2017.  The Mill's shutdown was scheduled to last through February 12, 2017.

70.     By February 8, 2017, the Mill's kraft pulping process was shut down.

71.     Prior to beginning the welding repairs on the clean condensate pipeline, the pipeline had been emptied, but the foul condensate tank still contained approximately 2,453 pounds of methanol in a 1% solution.  Although the Defendant had drained the foul condensate tank for maintenance work in the past, it failed to do so in this instance.

72.     On February 8, 2017, personnel from the Defendant's contractor, Elite, entered the DeRidder Mill and requested a hot work permit from the Defendant.

73.     The Defendant dispatched its lab technician to perform atmospheric monitoring of the area surrounding the welding site at the clean condensate pipeline.  However, the technician only monitored near the welding site and did not check the inside of the foul condensate tank for a flammable atmosphere.  Given the size of the foul condensate tank, monitoring should have also occurred at multiple locations around the tank.  Consequently, Mill personnel were unaware of the potential explosion hazard within the foul condensate tank.  The Defendant ultimately issued the hot work permit to Elite.

74.     As the foul condensate tank cooled during the shutdown, air likely entered through a pressure vacuum breaker, used to maintain pressure in the tank during normal operations, located on the roof of the foul condensate tank.  The cooling created a low-pressure

condition within the tank.  As air entered the tank, it mixed with turpentine vapor inside the tank and formed an explosive mixture.  Consequently, because the foul condensate tank had not been fully drained prior to the shutdown, it likely contained water, a layer of flammable liquid turpentine on top of the water, and an explosive vapor space containing a mixture of air, turpentine, and methanol vapor.

75.     After PCA issued the hot work permit, Elite's workers began repairing the crack at the junction of the eight-inch clean condensate pipeline to the three-inch pipeline.  Elite's workers placed a welding blanket over a portion of the top of the foul condensate tank, but did not cover the entirety of the tank.

76.     Elite's workers were welding and cutting approximately three feet away from the foul condensate tank and six to eight feet above the pressure vacuum breaker on the roof of the tank.

77.     While Elite was working on the clean condensate pipeline, the foul condensate tank ignited and flew 375 feet through the air, traveling over a six-story building before landing on process equipment.  The Explosion killed three of Elite's workers and injured seven others.

78.     The Explosion released extremely hazardous substances into the ambient air.  The release included an estimated 2,453 pounds of methanol (in a 1% solution), as well as turpentine. The Explosion therefore constituted an "accidental release" within the meaning of Clean Air Act Section 112(r)(2)(A), 42 U.S.C. § 7412(r)(2)(A), and the Risk Management Program Regulations.

**The Inspection**

79.     In response to the Explosion, EPA and LDEQ conducted an inspection and document review at the DeRidder Mill from May 2-4, 2017.  The inspection and document

review resulted in the violation of the Act's General Duty Clause and led to the discovery of the additional violations of the Act's Risk Management Program Regulations, alleged *infra*.

### FIRST CLAIM FOR RELIEF
**(General Duty Clause – Failure to Design and Maintain a Safe Facility)**
**(40 U.S.C. § 7412(r)(1))**

80.     The preceding paragraphs are re-alleged and incorporated herein by reference.

81.     The Defendant violated Section 112(r)(1) of the Act, 42 U.S.C. § 7412(r)(1), by failing to design and maintain a safe facility and by failing to take such steps as necessary to prevent accidental releases of extremely hazardous substances.  From at least February 4, 2017, PCA failed to ensure that non-condensable gases were drained and purged from the foul condensate tank prior to allowing contractors to perform hot work above it.  The Defendant's violation continued through February 8, 2017, the day of the Explosion.

82.     The Defendant recognized or should have recognized the risk of an accidental release of extremely hazardous substances, including highly flammable substances such as methanol and turpentine, caused by failing to drain and purge non-condensable gases in the foul condensate tank prior to allowing contractors to perform hot work above it.

83.     Industry standards, such as the TAPPI TIP 0416-09 and NFPA Standard 51B, illustrated industry-wide recognition of the potential hazard of an accidental release of extremely hazardous substances, including highly flammable substances such as methanol and turpentine, caused by failing to drain and purge non-condensable gases in the foul condensate tank prior to allowing contractors to perform hot work above it.

84.     The Defendant's Hot Work Permit Procedure expanded upon the precautions in NFPA Standard 51B to address the potential hazard of an accidental release of extremely hazardous substances, including highly flammable substances such as methanol and turpentine,

caused by failing to drain and purge non-condensable gases in the foul condensate tank prior to allowing contractors to perform hot work above it.

85.     The Defendant's failure to drain and purge non-condensable gases in the foul condensate tank prior to allowing contractors to perform hot work above it caused the Explosion.

86.     There were feasible means by which the Defendant could have eliminated or reduced this hazard, including draining and purging the non-condensable gases in the foul condensate tank prior to allowing contractors to perform hot work above it, or by properly using a listed or approved welding curtain, blanket, pad, or equivalent to cover the entire foul condensate tank.

87.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable to the United States for a civil penalty of up to $109,024 per day for each violation.

**SECOND CLAIM FOR RELIEF**
**(Program 3 Prevention Program – Hot Work Operations)**
**(40 C.F.R. § 68.85)**

88.     Paragraphs 1-79 are re-alleged and incorporated herein by reference.

89.     From at least September 18, 2015 through October 15, 2018, the Defendant violated 40 C.F.R. § 68.85(b), 42 U.S.C. § 7412(r)(7)(E), and LAC 33:III.5901.A by improperly issuing hot work permits for various hot work operations conducted on or near a covered process.

90.     During this time period, the Defendant's hot work permitting program violated 40 C.F.R. § 68.85(b) because various permits issued pursuant to the program failed to consistently and sufficiently document, and thereby verify, that the fire prevention and protection requirements in 29 C.F.R. §§ 1910.252(a)(2)(iii)(A)(4) and (a)(2)(iii)(B) were to be executed at

the conclusion of hot work operations at the Mill.  The Defendant's hot work permits contained a precautions checklist that was often left blank, thereby failing to document that the requirement for a fire watch to be maintained for at least 30 minutes would be executed after completion of welding or cutting operations.

91.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable to the United States for a civil penalty of up to $109,024 per day for each violation.

92.     Pursuant to La. R.S. 30:2025(E)(1)(a), the Defendant is liable to LDEQ for a civil penalty of up to $32,500 per day for each violation.

**THIRD CLAIM FOR RELIEF**
**(Program 3 Prevention Program – Mechanical Integrity)**
**(40 C.F.R. § 68.73)**

93.     Paragraphs 1-79 are re-alleged and incorporated herein by reference.

94.     From at least September 18, 2015 through April 30, 2016, the Defendant violated 40 C.F.R. § 68.73(b), 42 U.S.C. § 7412(r)(7)(E), and LAC 33:III.5901.A by failing to establish and implement adequate written procedures to maintain the ongoing integrity of the Mill Water Chlorine System's six chlorine gas sensors.  Alternatively, the Defendant violated 40 C.F.R. § 68.73(d)(4) by failing to document each inspection and test that it performed on the six chlorine sensors.

95.     During this time period, the Defendant violated 40 C.F.R. § 68.73(b) by failing to comply with its own internal mechanical integrity procedures requiring the Defendant to conduct and document monthly preventative maintenance inspections on the six chlorine gas sensors. The Defendant failed to maintain any preventative maintenance records for the six chlorine gas sensors, such as records of tests or inspections.

96.     Consequently, the Defendant failed to adequately implement its mechanical integrity procedures for maintaining the six chlorine gas sensors in accordance with 40 C.F.R. § 68.73(b) or failed to properly document the implementation of its preventative maintenance procedures during this time in accordance with 40 C.F.R. § 68.73(d)(4).

97.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable to the United States for a civil penalty of up to $109,024 per day for each violation.

98.     Pursuant to La. R.S. 30:2025(E)(1)(a), the Defendant is liable to LDEQ for a civil penalty of up to $32,500 per day for each violation.

## FOURTH CLAIM FOR RELIEF
### (Program 3 Prevention Program – Mechanical Integrity)
### (40 C.F.R. § 68.73)

99.     Paragraphs 1-79 are re-alleged and incorporated herein by reference.

100.    From at least September 18, 2015 through October 15, 2018, the Defendant violated 40 C.F.R. § 68.73(c), 42 U.S.C. § 7412(r)(7)(E), and LAC 33:III.5901.A by failing to adequately train each employee involved in maintaining the ongoing integrity of the Mill Water Chlorine System's six chlorine gas sensors in the procedures applicable to the employee's job tasks.  Alternatively, the Defendant violated 40 C.F.R. § 68.200 by failing to maintain records demonstrating that the requirements of 40 C.F.R. § 68.73(c) were implemented with respect to each employee involved in maintaining the ongoing integrity of the Mill Water Chlorine System's six chlorine gas sensors.

101.    During this time period, the Defendant failed to prepare or maintain records identifying trained employees, the date(s) of training, and the means used for verification of the employees' understanding of any training pertaining to the mechanical integrity/preventative

maintenance of the chlorine gas sensors.

102.     Consequently, the Defendant failed to adequately train its employees or to maintain records demonstrating that the individuals responsible for mechanical integrity/preventative maintenance testing on chlorine gas sensors were adequately trained in accordance with 40 C.F.R. § 68.73(c).

103.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable to the United States for a civil penalty of up to $109,024 per day for each violation.

104.     Pursuant to La. R.S. 30:2025(E)(1)(a), the Defendant is liable to LDEQ for a civil penalty of up to $32,500 per day for each violation.

**FIFTH CLAIM FOR RELIEF**
**(Program 3 Prevention Program – Mechanical Integrity)**
**(40 C.F.R. § 68.73)**

105.     Paragraphs 1-79 are re-alleged and incorporated herein by reference.

106.     From at least May 1, 2016 through October 15, 2018, the Defendant violated 40 C.F.R. § 68.73(d)(4), 42 U.S.C. § 7412(r)(7)(E), and LAC 33:III.5901.A by failing to keep documentation identifying the serial number or other identifier of equipment on which required inspections or tests were performed.

107.     During this time period, the Defendant failed to maintain adequate documentation of monthly preventative maintenance and leak detection testing on the Mill Water Chlorine System's six chlorine gas detectors.  The Defendant's testing documents showed only the general location of each chlorine gas sensor (*e.g.*, "north") and failed to list each sensor's serial number or other unique identifier.

108.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable to the United States for a civil penalty of up to $109,024 per day for each violation.

109.    Pursuant to La. R.S. 30:2025(E)(1)(a), the Defendant is liable to LDEQ for a civil penalty of up to $32,500 per day for each violation.

**SIXTH CLAIM FOR RELIEF**
**(Program 3 Prevention Program – Management of Change)**
**(40 C.F.R. § 68.75)**

110.    Paragraphs 1-79 are re-alleged and incorporated herein by reference.

111.    From at least January 20, 2016 through October 15, 2018, the Defendant violated 40 C.F.R. § 68.75(c), 42 U.S.C. § 7412(r)(7)(E), and LAC 33:III.5901.A by failing to inform and train employees and contractors, whose job tasks were affected by two changes in the Mill Water Chlorine System, about the changes prior to the start-up of the Mill Water Chlorine System or affected part of the Mill Water Chlorine System.  Alternatively, the Defendant violated 40 C.F.R. § 68.200 by failing to maintain records demonstrating that the requirements of 40 C.F.R. § 68.75(c) were implemented with respect to each employee and contractor affected by the two changes in the Mill Water Chlorine System.

112.    The Defendant was unable to produce documentation confirming that the relevant employees and contractors received information and/or training during this time period about the process changes specified in Management of Change #19 (additional chlorine leak signal light, amplifier, sensor, and horn added to chlorination building) and Management of Change #20 (chlorine alarm warning point to 0.5 ppm).

113.    Consequently, the Defendant failed to inform and train employees and contractors or to maintain records demonstrating that employees and contractors, whose job tasks were

affected by two changes in the Mill Water Chlorine System, were informed and trained in accordance with 40 C.F.R. § 68.75(c).

114.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable to the United States for a civil penalty of up to $109,024 per day for each violation.

115.    Pursuant to La. R.S. 30:2025(E)(1)(a), the Defendant is liable to LDEQ for a civil penalty of up to $32,500 per day for each violation.

### SEVENTH CLAIM FOR RELIEF
**(Program 3 Prevention Program – Emergency Response Program)**
**(40 C.F.R. § 68.95)**

116.    Paragraphs 1-79 are re-alleged and incorporated herein by reference.

117.    From at least September 18, 2015 through October 15, 2018, the Defendant violated 40 C.F.R. § 68.95(a)(2), 42 U.S.C. § 7412(r)(7)(E), and LAC 33:III.5901.A by failing to develop and implement an emergency response program to protect public health and the environment, which included procedures for the inspection, testing, and maintenance of emergency response equipment.  Alternatively, the Defendant violated 40 C.F.R. § 68.200 by failing to maintain records demonstrating that the requirements of 40 C.F.R. § 68.95(a)(2) were implemented with respect to the development and implementation of an emergency response program with procedures for the inspection, testing, and maintenance of emergency equipment.

118.    The Defendant failed to provide records documenting that inspections occurred during this time period for multiple pieces of its emergency response equipment including, but not limited to, the Mill's rescue truck, fire equipment, fire truck bunker gear, and loose bunker gear.

119.    Consequently, the Defendant failed to develop and implement an emergency response program with procedures for the inspection, testing, and maintenance of emergency response equipment or to maintain records demonstrating that it developed and implemented an emergency response program with procedures for the inspection, testing, and maintenance of emergency response equipment in accordance with 40 C.F.R. § 68.95(a)(2).

120.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable to the United States for a civil penalty of up to $109,024 per day for each violation.

121.    Pursuant to La. R.S. 30:2025(E)(1)(a), the Defendant is liable to LDEQ for a civil penalty of up to $32,500 per day for each violation.

## EIGHTH CLAIM FOR RELIEF
### (Program 3 Prevention Program – Process Safety Information)
### (40 C.F.R. § 68.65)

122.    Paragraphs 1-79 are re-alleged and incorporated herein by reference.

123.    From at least September 18, 2015 through May 4, 2017, the Defendant violated 40 C.F.R. § 68.65(d)(1)(ii), 42 U.S.C. § 7412(r)(7)(E), and LAC 33:III.5901.A by failing to complete a compilation of accurate written process safety information at its Mill Water Chlorine System.

124.    During this time period, the Defendant did not have an accurate piping and instrumentation diagram for the Mill Water Chlorine System.  The system had a total of six chlorine gas sensors, yet the Defendant's piping and instrumentation diagram only illustrated five unique sensors – "CS-17," "CS-18," "CS-19," "CS-20," and "CS-21."

125.    Until approximately May 4, 2017, the "CS-22" sensor was not individually depicted on the piping and instrumentation diagram.  The "CS-20" chlorine gas sensor was

incorrectly duplicated in the diagram, instead of showing the two distinct sensors: "CS-20" and "CS-22."

126.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable to the United States for a civil penalty of up to $109,024 per day for each violation.

127.     Pursuant to La. R.S. 30:2025(E)(1)(a), the Defendant is liable to LDEQ for a civil penalty of up to $32,500 per day for each violation.

### NINTH CLAIM FOR RELIEF
### (Program 3 Prevention Program – Operating Procedures
### (40 C.F.R. § 68.69)

128.     Paragraphs 1-79 are re-alleged and incorporated herein by reference.

129.     From at least August 6, 2016 until September 26, 2016, the Defendant violated 40 C.F.R. § 68.69(c), 42 U.S.C. § 7412(r)(7)(E), and LAC 33:III.5901.A by failing to certify annually that its operating procedures for its Mill Water Chlorine System were current and accurate.

130.     The Defendant certified its operating procedures on August 7, 2015, but failed to certify its operating procedures again until September 26, 2016, more than one year after its August 7, 2015 certification.

131.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended, the Defendant is liable to the United States for a civil penalty of up to $109,024 per day for each violation.

132.     Pursuant to La. R.S. 30:2025(E)(1)(a), the Defendant is liable to LDEQ for a civil penalty of up to $32,500 per day for each violation.

## **RELIEF SOUGHT**

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.     Enter judgment in favor of the United States and LDEQ against Defendant Packaging Corporation of America;

B.     Assess civil penalties in favor of the United States against Defendant Packaging Corporation of America in an amount of up to $109,024 per day for each violation of the Clean Air Act, 42 U.S.C. § 7413(b), as amended;

C.     Assess civil penalties in favor of LDEQ against Defendant Packaging Corporation of America in an amount of up to $32,500 per day for each violation of La. R.S. 30:2025(E)(1)(a);

D.     Award the United States and LDEQ its costs and expenses incurred in this action; and

E.     Grant such other relief as this Court may deem just and proper.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA:**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Dated:  September 28, 2022          _____*/s/ Christopher B. Witwer*_____
CHRISTOPHER B. WITWER
Trial Attorney
NY Bar No. 4464418
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P. O. Box 7611 Ben Franklin Station
Washington, DC 20044
(202) 598-3122 (Telephone)
christopher.witwer@usdoj.gov


BRANDON B. BROWN
United States Attorney
Western District of Louisiana


SHANNON T. BROWN
Assistant United States Attorney
LA Bar No. 32366
U.S. Attorney's Office
Western District of Louisiana
300 Fannin Street, Suite 3201
Shreveport, LA 71101
(318) 676-3600
shannon.brown@usdoj.gov

Of Counsel:
COURTNEY CARTER
Assistant Regional Counsel (MC 6RC-ER)
U.S. Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500
Dallas, Texas 75270
(214) 665-8175 (Telephone)
carter.courtney@epa.gov

**FOR THE LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY:**

Dated:  9-26-22

OSCAR MAGEE
Attorney
LA Bar No. 32302
Louisiana Department of Environmental Quality
Office of the Secretary
Legal Division
P.O. Box 4302
Baton Rouge, LA 70821-4302
(225) 219-4046 (Telephone)
(225) 219-4068 (Facsimile)
oscar.magee@la.gov